

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00066-CR
No. 02-24-00067-CR

———————————————————

DGJUAN FIELDS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court Nos. 1765791, 1809749

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Dgjuan Fields appeals three convictions, two in appellate cause number 02-24-00066-CR (trial court cause number 1765791) and one in appellate cause number 02-24-00067-CR (trial court cause number 1809749).

In appellate cause number 02-24-00066-CR, a jury found Fields guilty of (1) the first-degree felony of possessing methamphetamine, a controlled substance, of four grams or more but less than two hundred grams with the intent to deliver, *see* Tex. Health & Safety Code Ann. §§ 481.102(6) ("Penalty Group 1"), 481.112(d) ("Offense: Manufacture or Delivery of Substance in Penalty Group 1"), and (2) the first-degree felony of possessing fentanyl, a controlled substance, of four grams or more but less than two hundred grams with the intent to deliver, *see id.* §§ 481.1022 ("Penalty Group 1-B"), 481.1123(d) ("Offense: Manufacture or Delivery of Substance in Penalty Group 1-B"). The jury also made a deadly weapon finding. For the methamphetamine offense, the jury assessed a punishment of confinement for forty years, and for the fentanyl offense, the jury assessed a punishment of confinement for fifty years.

In appellate cause number 02-24-00067-CR, a jury found Fields guilty of the third-degree felony offense of unlawful possession of a firearm by a felon and assessed his

punishment at imprisonment for ten years.  *See* Tex. Penal Code Ann. § 46.04(a), (e).  The three sentences run concurrently.[1]

Fields appeals all three convictions.  In three issues, Fields argues: (1) the trial court erred by refusing an evidentiary hearing on his motion for new trial; (2) the evidence was insufficient to show that he possessed a "controlled substance" as that term is defined in the Texas Health and Safety Code; and (3) the jury charge contained error because (a) it included an abstract instruction of a "constructive transfer" but did not incorporate a constructive transfer into the application paragraph, and (b) it did not define "controlled substance" as that term is defined in the Texas Health and Safety Code.

We hold that (1) because Fields did not present his motion for new trial or request a hearing, he has not preserved his first issue; (2) whether a substance is a controlled substance is a question of law and not of fact; (3)(a) assuming that including a "constructive transfer" instruction in the charge was error, Fields cannot show egregious harm; and (3)(b) the charge did not have to include the statutory controlled-substances definition or identify the statutes identifying methamphetamine and fentanyl

---

[1]The record shows the trial court reciting the jury's verdicts but not actually sentencing Fields.  "There, of course, is the presumption of the regularity of the judgment of conviction and the proceedings absent a showing to the contrary."  *Ex parte Wilson*, 716 S.W.2d 953, 956 (Tex. Crim. App. 1986) (op. on reh'g); *Barnard v. State*, No. 05-93-00156-CR, 1995 WL 110158, at *1 (Tex. App.—Dallas Mar. 15, 1995, no pet.) (not designated for publication) ("[The appellant] contends . . . that the trial court erred by assessing his punishment without sentencing him.  Although the [reporter's record] does not reflect a sentencing, the judgment reflects that [he] was sentenced. . . . The recitations in the judgment [bind the appellant] in the absence of direct proof to the contrary.").

as controlled substances. Accordingly, we overrule Fields's three issues and affirm the trial court's judgments.

## II. Background

In December 2022, an agent from the Drug Enforcement Administration provided Officer William Snow with information regarding Fields and with the name that Fields used on Instagram. Officer Snow discovered that on Instagram, Fields would have daily postings of different drugs for sale; for example, Fields would post the prices for marijuana—by the pound—and on January 24, 2023, he posted, "Blues are in." "Blues," explained Officer Snow to the jury, was the street term for fentanyl pills.

Officer Snow also noted multiple pictures and stories of Fields in possession of firearms. After doing some research, Officer Snow determined that Fields was a convicted felon—for aggravated robbery with a deadly weapon, a firearm—and had served five years in prison. Officer Snow also learned that in January 2023, a warrant had issued for Fields's arrest.

To determine where Fields lived, Officer Snow had a confidential informant contact Fields through Instagram and ask for a specific amount of narcotics. Fields responded with a price and an address—3501 R*** Street.

From experience, however, Officer Snow knew that dealers usually did not provide correct addresses. He explained at trial that dealers gave false addresses for

4

their personal safety because they had to worry about getting robbed by either customers or other drug dealers. Dealers also had to look out for law enforcement.

One day after Fields had posted that the "blues" were in, on January 25, Officer Snow used a different confidential informant to go to the 3501 R*** Street address to make a purchase. In the process, from surveillance, Officer Snow determined that Fields was actually dealing from a house across the street at 3424 R*** Street. Officer Snow explained, "We observed vehicles coming and going to that one particular house and basically people walking up to the house and back, short-term traffic." Armed with this new information, Officer Snow instructed the confidential informant to purchase fentanyl pills from the 3424 R*** Street residence. The informant purchased fentanyl pills, but based on the informant's description of the seller, the informant did not buy the drugs from Fields personally; the informant was, however, able to verify that Fields was inside the house. Officer Snow then drafted and obtained a search warrant for the residence.

Officer Snow used a special-weapons-and-tactics unit (SWAT) to execute the search warrant. SWAT's job was to secure the residence, any individuals inside the residence, and any individuals running from the residence.

SWAT arrived within an hour after the confidential informant had made the controlled purchase. When SWAT approached the residence, people were in the front yard. Some individuals ran north, some ran south, and some ran back into the house.

Sergeant Justin Williams arrested Fields about three houses down from the targeted house. When searched, Fields had neither drugs nor weapons. But officers discovered $5,050 in cash on his person.

And Officer Daniel Villeneuve chased and eventually arrested Alrod Stewart.[2] While Officer Villeneuve chased Stewart, he saw Stewart toss an object to the ground, and when Officer Villeneuve later searched the area, he found under a car a bag of chips that contained several baggies of blue pills. A photograph of the baggies shows five baggies and, beside them, a tally of the number of pills in each baggie; the total count was 228 pills. A forensic scientist later tested forty tablets and determined that they consisted of 4.303 grams of fentanyl, including any adulterants and diluents.

Also recovered from Fields and Stewart were two $20 bills linked to the controlled buy. Officer Snow explained that before making a controlled purchase, the bills given to the informant to buy the narcotics were photographed for their serial numbers. Officer Snow recovered $40 of the $60 "buy money." Fields and Stewart each had $20.

Inside the house, SWAT detained Fields's brother, Trayveon. The police interviewed Trayveon, who admitted that he would meet clients and send them to the house, which was Fields's, and Fields would supply them with marijuana or whatever other drug they wanted.

---

[2]Alrod Stewart was also referred to as Andron Stewart or Anrod Stewart.

6

Officer Snow also found contraband inside the house. Officer Snow testified that the kitchen the police searched was the same one shown in Fields's Instagram postings. In a kitchen cabinet, the police found a baggie of multicolored pills that they believed were MDMA or, as known on the street, "ecstasy." A photograph of the baggie showed innumerable pills. The forensic scientist later tested fifteen of the pills as a sample and determined that they contained 4.273 grams of methamphetamine, including adulterants or diluents. Regarding Officer Snow's misidentification of the pills as MDMA, he explained that MDMA and methamphetamine were both stimulants and contained methamphetamine, so it was possible for a field test to show one controlled substance but a confirmatory test to show an additional or different controlled substance.

Also found in the kitchen was a baggie of "small blue M30 pills"[3] that Officer Snow believed to be fentanyl. A photograph of the baggie found inside the kitchen showed perhaps six pills. A forensic scientist later determined that one of these pills consisted of .115 grams of fentanyl, including any adulterants and diluents. The blue pills found inside the kitchen had the same M30 stamp as those found in the bag of chips.

On the kitchen counter was a Glock pistol. In the master bedroom were the buttstock of an AR pistol, the AR pistol, and a second Glock pistol with a drum magazine.

---

[3]Blue pills sold on the street are known to be stamped with an "M" and a "30" to counterfeit Percocet. *See Jimenez v. State*, No. 02-23-00348-CR, 2025 WL 211319, at *1, *4 (Tex. App.—Fort Worth Jan. 16, 2025, no pet.) (mem. op., not designated for publication).

The police found other items linking Fields to the house and to drug dealing. On the kitchen counter were multiple scales. Body armor was on the floor in the living room. Body armor, Officer Snow noted, was illegal for a felon to possess. In addition to the methamphetamine and fentanyl, police found several baggies of a green leafy substance believed to be marijuana in the kitchen cabinet and thirty-five THC vape pens in the living room. Officer Snow explained that THC was more potent than marijuana and was a controlled substance. In the bedroom was a video recorder for the cameras that were mounted around the outside of the house. Officer Snow stated that based on his experience, it was common for drug dealers to have surveillance cameras. In the bedroom too were a check made payable to Fields and two letters from the IRS addressed to him—but none with the address from which Fields was dealing drugs. Despite that, Officer Snow stated that in his experience, individuals do not carry around their mail to locations where they do not live. A third letter from Spectrum had both Fields's name and the 3424 R*** Street address. Fields's social security card was also found in the residence.

### III.  Discussion

Fields presents three issues. The first addresses the absence of a hearing on his motion for new trial, the second questions whether the evidence was sufficient to show that the drugs that the police found were controlled substances, and the third complains about two instances of alleged error in the jury charge.

## A. Absence of Hearing on Motion for New Trial

In Fields's first issue, he argues that the trial court erred by refusing an evidentiary hearing on his motion for new trial. The record, however, does not show that Fields ever presented his motion or requested a hearing.

A hearing on a motion for new trial is not an absolute right. *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). Generally, if the motion and attached affidavit raise matters that are not determinable from the record that could entitle the defendant to relief, a trial court should hold a hearing. *Id.* But in addition to timely filing the motion with supporting affidavits showing reasonable grounds for believing that some error has occurred, the defendant must present the motion to the trial court, and if he wants a hearing on it, he must request one. *Id.*

Under the Texas Rules of Appellate Procedure, a criminal defendant must timely "present" a motion for new trial to the trial court. Tex. R. App. P. 21.6. To prove presentment, the record must show that the trial court had actual notice that the defendant wanted a ruling or a hearing on the motion. *Harris v. State*, 668 S.W.3d 83, 91–92 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (op. on en banc reconsideration). "Merely filing the motion is not sufficient alone to show presentment." *Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009). Examples of presentment include obtaining the trial court's ruling on the motion for new trial, the judge's signature or notation on a proposed order, or a hearing date on the docket sheet. *Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998); *Burrus v. State*, 266 S.W.3d

9

107, 115 (Tex. App.—Fort Worth 2008, no pet.) (mem. op.). An electronic filing does not satisfy the presentment requirement. *See Huff v. State*, No. 02-22-00254-CR, 2023 WL 5617124, at *4 (Tex. App.—Fort Worth Aug. 31, 2023, no pet.) (mem. op., not designated for publication). To preserve a complaint that the trial court erred by not having a hearing, a defendant must first request one. *Rozell*, 176 S.W.3d at 230.

Here, Fields points to a letter that counsel filed showing that the motion was successfully faxed to the court along with the fax confirmation. But all the letter and the fax confirmation show are that something forty-one pages long was faxed successfully. Fields's motion for new trial, along with the attachments, was thirteen pages long. Assuming, without deciding, that the document faxed was or included Fields's motion for new trial, all the letter and fax confirmation show is that the motion was filed.

Fields also asserts that the motion appears on the trial court's docket. The document in question is the "Record of Criminal Actions," and all that its entries show is that Fields filed a motion for new trial.

We also note that the fiat attached to the motion is left blank and is not signed by the judge.

Thus, our record shows that Fields filed his motion for new trial, but it does not show that he presented it or that he requested a hearing. *See Carranza*, 960 S.W.2d at 79. He has not preserved his complaint. *See Rozell*, 176 S.W.3d at 230. We overrule Fields's first issue.

**B. Whether Sufficient Evidence Shows the Drugs were Controlled Substances**

In Fields's second issue, he contends that the evidence was not sufficient to show that he possessed a "controlled substance" as that term is defined in the Texas Health and Safety Code. Specifically, Fields contends that although there was evidence that the substances found were methamphetamine and fentanyl, there was no evidence that methamphetamine and fentanyl were controlled substances.

But whether a drug is a controlled substance is a question of law, not a question of fact. *Raymos v. State*, Nos. 05-23-00294-CR, 05-23-00295-CR, 2024 WL 3218221, at *1 (Tex. App.—Dallas June 28, 2024, no pet.) (mem. op., not designated for publication); *Plumlee v. State*, No. 02-17-00174-CR, 2018 WL 3153543, at *5 (Tex. App.—Fort Worth June 28, 2018, pet. ref'd) (mem. op., not designated for publication). The jury charge informed the jurors that methamphetamine and fentanyl were, under Texas law, controlled substances: "Under our law, methamphetamine, fentanyl, and alpha-methylfentanyl are controlled substances." The penalty group is not an element of the offense.[4] *Roberson v. State*, No. 05-15-00550-CR, 2016 WL 3517937, at *2 (Tex. App.—Dallas June 20, 2016, no pet.) (mem. op., not designated for publication). Once the State proves which controlled substance the defendant possessed, it necessarily proves the penalty group applicable to the offense. *Raymos*, 2024 WL 3218221, at *1.

---

[4]This is consistent with Fields's indictment, which identified the controlled substances (methamphetamine and fentanyl) but did not identify the penalty groups under which methamphetamine and fentanyl fell.

We thus overrule Fields's second issue.[5]

## C. Alleged Error in Jury Charge

In Fields's third issue, he maintains that the jury charge contained error because (a) it contained an abstract instruction on "constructive transfer" but did not incorporate "constructive transfer" into the application paragraph and (b) it did not define "controlled substance" as that term is defined in the Texas Health and Safety Code. Fields thus complains about two alleged errors in the jury charge. We address the alleged errors separately.

### 1. Constructive Transfer

Fields maintains that an indictment for delivery of a controlled substance must specify which type of delivery was performed. *See Conaway v. State*, 738 S.W.2d 692, 694 (Tex. Crim. App. 1987); *Young v. State*, 183 S.W.3d 699, 706 (Tex. App.—Tyler 2005, pet. ref'd). Fields complains that although the instructions addressed a constructive transfer, the application paragraphs did not incorporate constructive transfers. Fields asserts that the trial court necessarily erred by either (1) including an instruction on constructive transfer or (2) assuming the constructive-transfer instruction was properly included, not incorporating constructive transfer into the application paragraph.

---

[5]Officer Snow testified that the police found "contraband" inside the house. "Contraband" would have included controlled substances. *See Contraband*, Black's Law Dictionary (12th ed. 2024) ("Goods that are unlawful to import, export, produce, or possess.").

Fields, however, was not charged with delivery of methamphetamine and fentanyl. *See Jackson v. State*, 84 S.W.3d 742, 744–45 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (addressing delivery-of-a-controlled-substance offense). When delivery is alleged, the defendant is entitled to know on which of the three possible modes of delivery the State will rely. *Gonzales v. State*, 638 S.W.2d 41, 44 (Tex. App.—Houston [1st Dist.] 1982, pet. ref'd).

Rather, Fields was charged with possessing methamphetamine and fentanyl with the intent to deliver. The question was not whether Fields delivered any controlled substances. The question was whether he possessed any controlled substances with the intent to deliver. When the State alleges possession with the intent to deliver, courts are not concerned with delivery because no delivery occurred. *Id.*; *see Lopez v. State*, 108 S.W.3d 293, 300 (Tex. Crim. App. 2003) (stating that "if an actor possesses a quantity of drugs sufficient to permit the jury to conclude that he possessed them with the intent to distribute them, . . . any existing offer to sell or prospective buyer" is not necessary for conviction).

The only evidence of an arguably constructive transfer[6] was the confidential informant's purchase of fentanyl from someone other than Fields, but the State did not

---

[6]The charge provided,

"Delivery" means the actual or constructive transfer from one person to another of a controlled substance, whether or not there is an agency relationship. Constructive transfer is the transfer of a controlled

rely on those drugs when calculating the amount he possessed. Instead, the State relied on the methamphetamine and the fentanyl found inside the house and the fentanyl that Stewart discarded under the car.

The State argues that the abstract instruction can be ignored as surplusage and is, thus, not erroneous. *Curry v. State*, 30 S.W.3d 394, 399 (Tex. Crim. App. 2000) (relying on *Burrell v. State*, 526 S.W.2d 799, 802 (Tex. Crim. App. 1975), *overruled by Gollihar v. State*, 46 S.W.3d 243, 256 (Tex. Crim. App. 2001)). Because we decide that any error in the charge would ultimately not constitute egregious harm, we will assume, without deciding, that the abstract instruction was erroneous. *See Olivarez v. State*, No.

---

substance either belonging to an individual or under his direct or indirect control by some other person at the instance or direction of the individual accused of such constructive transfer.

The Eastland Court of Appeals has written,

For the evidence to be sufficient in cases that involve the constructive delivery or transfer of drugs when the transferee is not the immediate transferee, a defendant must have had either "direct or indirect control of the substance transferred" and "the transferor must know of the existence of the transferee." *Sims v. State*, 117 S.W.3d 267, 277 (Tex. Crim. App. 2003). A "defendant must have contemplated that there would in fact be a third party transferee." *Id.* It is not necessary, however, for the State to prove that Appellant knew the identity of the ultimate recipient of the drugs, only that Appellant knew that his initial transfer was not the end of the distribution cycle. *Daniels v. State*, 754 S.W.2d 214, 222 (Tex. Crim. App. 1988).

*Jackson v. State*, Nos. 11-18-00308-CR, 11-18-00309-CR, 11-18-00310-CR, 2020 WL 6790937, at *6 (Tex. App.—Eastland Nov. 19, 2020, pet. ref'd) (mem. op., not designated for publication).

14

10-19-00214-CR, 2020 WL 6685901, at *2–3 (Tex. App.—Waco Nov. 12, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that "unnecessary and inappropriate" abstract instruction that was not incorporated into the application paragraph was error but was not egregiously harmful).

Fields did not object to the jury charge. Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Here, the record does not show egregious harm for two reasons—the strength of the State's evidence and the State's theory of the case.

The State's case against Fields was very strong. The evidence showed that Fields advertised that he was dealing drugs on Instagram. Officer Snow saw activity that he associated with drug dealing at Fields's house. When SWAT arrived, Fields ran from the house with a large amount of cash and Stewart ran from the house with the bulk of the fentanyl that Fields had advertised only the day before as having arrived. Fields and Stewart each possessed a $20 bill that Officer Snow had used in a controlled fentanyl purchase only an hour earlier. The charge instructed the jury on the law of parties. The evidence that Fields possessed the methamphetamine and fentanyl with the intent to deliver was overwhelming.

Regarding the State's theory of the case, Fields was not charged with a delivery—constructive or otherwise. The evidence that the State relied on to convict Fields was the methamphetamine and fentanyl found inside the house and the fentanyl that Stewart discarded while being chased. The only delivery in the evidence—the drugs purchased during the controlled buy—were not tested or weighed by the forensic scientist. So the application paragraph, regardless of the abstract instruction, correctly reflected the State's theory of the case. *See Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013) (stating that the application portion of the charge, not the abstract portion, is what authorizes a conviction). We hold that Fields was not egregiously harmed. *See Olivarez*, 2020 WL 6685901, at *2–3; *Chavez v. State*, No. 10-13-00015-CR,

16

2013 WL 6409788, at *4–5 (Tex. App.—Waco Dec. 5, 2013, pet. ref'd) (mem. op., not designated for publication) (stating that in case alleging possession with intent to deliver, including a definition of constructive transfer was surplusage where there was no evidence of any constructive transfers and that appellant was not egregiously harmed by the definition where the evidence showed that the appellant was a dealer).

We overrule Fields's constructive-transfer contention.

### 2. Failure to Define "Controlled Substance" or Identify Penalty Group

Fields contends that the charge failed to define "controlled substance" and that the charge did not identify to which penalty group the substances belonged. Because there is a statutory definition of "controlled substance," Fields maintains that the charge had to include it. Specifically, Fields relies on Section 481.002(5) of the Texas Health and Safety Code, which provides:

> "Controlled substance" means a substance, including a drug, an adulterant, and a dilutant, listed in Schedules I through V or Penalty Group 1, 1-A, 1-B, 2, 2-A, 3, or 4. The term includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance. The term does not include hemp, as defined by Section 121.001, Agriculture Code, or the tetrahydrocannabinols in hemp.

Tex. Health & Safety Code Ann. § 481.002(5); *see, e.g.*, *Cochran v. State*, No. 06-22-00089-CR, 2022 WL 17686575, at *1–2 (Tex. App.—Texarkana Dec. 15, 2022, no pet.). (mem. op., not designated for publication) (addressing defendant's contention that failure to include Section 481.002(5) definition was error).

17

The trial court's jury charge must set forth the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14. Thus, the trial court must instruct the jury on each element of the offense or offenses charged and include each statutory definition that affects the meaning of an element of the offense. *McIlroy v. State*, 188 S.W.3d 789, 797 (Tex. App.—Fort Worth 2006, no pet.).

Here, the jury charge informed the jurors that methamphetamine and fentanyl were controlled substances under Texas law. The jury was thus told the law applicable to the case. *See* Tex. Code Crim. Proc. Ann. art. 36.14. The charge did not, however, quote the Section 481.002(5) definition or specify which statutes made methamphetamine and fentanyl illegal. *See* Tex. Health & Safety Code Ann. §§ 481.102(6) ("Penalty Group 1"), 481.1022 ("Penalty Group 1-B").

But whether a drug is a controlled substance is a question of law, not a question of fact. *Raymos*, 2024 WL 3218221, at *1; *Plumlee*, 2018 WL 3153543, at *5. The penalty group is not an element of the offense. *Roberson*, 2016 WL 3517937, at *2.

The factual question for the jury was whether Fields possessed methamphetamine and fentanyl, not whether methamphetamine and fentanyl were controlled substances. *See Raymos*, 2024 WL 3218221, at *2; *Onick v. State*, No. 02-18-00356-CR, 2019 WL 1950063, at *3 (Tex. App.—Fort Worth May 2, 2019, no pet.) (mem. op., not designated for publication) ("[B]ecause the individual controlled substance and not the penalty group is the essential element of the offense, the jury charge does not contain error with respect to the lack of definition or instruction that

18

cocaine, heroin, and methamphetamine are 'controlled substances listed in Penalty Group 1.'"). The jury determined that Fields possessed methamphetamine and fentanyl with the intent to deliver; as a matter of law, methamphetamine and fentanyl are controlled substances. *See Roberson*, 2016 WL 3517937, at *2 ("Cocaine is listed in penalty group one according to statute, so there was no fact-finding role for the jury as to whether cocaine is or is not listed in penalty group one.").

We hold that not including the statutory "controlled substance" definition and not identifying the respective penalty groups of methamphetamine and fentanyl was not charge error. *See Raymos*, 2024 WL 3218221, at *1; *Plumlee*, 2018 WL 3153543, at *5; *Roberson*, 2016 WL 3517937, at *2. We overrule Fields's controlled-substance argument.

Having overruled both of Fields's contentions, we overrule his third issue.

## IV. Conclusion

Having overruled Fields's three issues, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 10, 2025

19